IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN
_____

THE ESTATE OF ANTHONY MOURADIAN,

                         Plaintiff,                         OPINION AND ORDER

        v.                                                  23-cv-167-wmc

JACKSON COUNTY,
SCOTT BOWE,
LUCAS JOHNSON,
LINDA KELLER,
DUANE M. WALDERA,
ASHLEY HAKES,
PATRICIA JACOBSON,
FOOTPRINTS IN TIME MIDWIFERY SERVICES LLC,
JOHN DOES 2-10, and
ABC INSURANCE COMPANY,[1]

                         Defendants.
_____

        Shortly after pleading guilty to four felony charges and before sentencing, Anthony

Mouradian committed suicide while in the custody of the Jackson County Jail.

Mouradian's estate (the "Estate") filed this lawsuit against defendants Jackson County, its

sheriff, and certain of its jail employees, as well as healthcare providers who treated

Mouradian.  In its First Amended Complaint, the Estate claims that defendants violated

Mouradian's rights under federal and Wisconsin state law.  (Dkt. #26.)  Pending before

the court are: (1) defendants Footprints In Time Midwifery Services, LLC ("Footprints")

and its employee Patricia Jacobson's (collectively the "Footprints defendants") first motion

_____

[1] In its amended complaint filed on November 10, 2023, plaintiff purported to also proceed against
multiple Doe defendants and an unidentified insurance company.  However, none have been
identified to date, and the time for doing so has long since passed. Accordingly, the court will
dismiss these defendants.

for summary judgment based on the Wisconsin statute of limitations for medical claims; (2) the Estate's motion for a hearing on that motion; (3) Footprints defendants' motion to supplement an affidavit in support of that motion; (4) Footprints defendants' second motion for summary judgment on the merits; (5) the Estate's motion to strike Footprints defendants' brief in reply and supplemental proposed findings of fact in support of their second summary judgment motion; (6) defendant Ashley Hakes' motion for summary judgment; and (7) defendants Duane Waldera, Scott Bowe, Lucan Johnson, Linda Keller, and Jackson County's motion for summary judgment on the merits. (Dkt. ##63, 90, 91, 108, 153, 112, & 117.) In reply, defendants Bowe, Johnson, Keller, Waldra, and Jackson County also argue that this court should relinquish jurisdiction of the Estate's remaining state-law claims if summary judgment were to be granted on all of its federal claims. (Dkt. #149.)

The evidence of record establishes that the Estate was untimely in amending its complaint to add the Footprints defendants' and that the remaining defendants were not objectively unreasonable in their treatment and care for Mouradian. Therefore, the court will grant defendants' motions for summary judgment as to the Estate's Fourteenth Amendment claims, relinquish jurisdiction over the Estate's remaining supplemental, state-law claims, and direct the clerk of court to enter final judgment accordingly.

UNDISPUTED FACTS[2]

**A. The Parties**

The Estate brought this case on behalf of Anthony Mouradian, a former inmate at Jackson County Jail ("the Jail") in Black River Falls, Wisconsin.  Mouradian pleaded guilty to four felony charges on April 24, 2020, for felony burglary, stalking, bail jumping, and possession of methamphetamine.  Before his sentencing scheduled for July 2, 2020, Mouradian took his own life in the early hours of May 28, 2020.

Defendant Jackson County is a municipal corporation organized under the laws of the State of Wisconsin.  At all relevant times, Jackson County has been responsible for the training, supervision, policy and procedure, as well as implementation, at the Jackson County Sheriff's office and Jail.  At all relevant times to this case, defendant Duane Waldera was the elected Sheriff of Jackson County and responsible for the treatment of the Jail's detainees.  Defendants Captain Scott Bowe and Correctional Officers Lucas Johnson and Linda Keller worked at the Jail and also had responsibilities supervising and monitoring its detainees.

Defendant Ashley Hakes is a licensed psychologist, holding master's and doctoral degrees from the Wisconsin School of Professional Psychology.  During the relevant period, Hakes was under contract with the Jackson County Sheriff's Office to provide

---

[2] The following undisputed, material facts are drawn from defendants' replies in support of their proposed findings of fact (dkts. ##94, 147, & 152) and defendants' responses to plaintiff's proposed findings of fact (dkts. ##93, 148, & 151).

psychological services at the Jail one day per week, including face-to-face therapy to detainees like Mouradian.

Defendant Footprints in Time Midwifery Services, LLC, is a Wisconsin limited liability company that also contracted to provide medical services at the Jail. Under this contract, Footprints provided Advanced Practice Nurse Prescriber ("APNP") services to inmates, including medication management. As an APNP for Footprints, defendant Patricia Jacobson in particular provided these medication management services to Mouradian at the Jail.

### B. Medical Treatment at the Jail

#### 1. Intake and early treatment

On July 30, 2019, Mouradian was first booked into Jackson County Jail, exhibiting suicidal ideations and depressive thoughts. Out of concern for his safety, Jail staff placed him on a suicide watch. On August 1, 2019, Mouradian specifically stated that he wanted to use a bedsheet to kill himself, and the next day, August 2, he met with the Jail's contract psychologist, Dr. Hakes, for the first time, telling Hakes that he wanted her to take him out back and shoot him.[3] After Hakes reassessed Mouradian on August 9, she recommended taking him off suicide watch but keeping him in a side cell.[4] However, in an email to Bowe, Jacobson, and nondefendant Travis Brown, Dr. Hakes also indicated

---

[3] During each meeting with Mouradian, Hakes kept detailed Subjective Objective Assessment Plan ("SOAP") Notes detailing his mood symptoms, suicidal thoughts, and safety concerns. Additionally, Hakes would email Jail Captain Bowe, updating him on Mouradian's status.

[4] The Jail's side cell is a holding cell with a concrete slab bunk located near the control area and used by staff to house inmates who may benefit from increased visibility or observation.

that Mouradian had "severe depression" and "endorsed passive suicidal ideation," prompting her recommendation for restrictions being placed on his writing utensils.

From August 9 through December 20, 2019, Hakes and Mouradian met almost every week to attempt a variety of therapeutic strategies. On several occasions, Hales also asked APNP Jacobson to reevaluate Mouradian's medications. Hakes also continually reported to Captain Bowe and APNP Jacobson that Mouradian exhibited major depressive symptoms, his symptoms were treatment-resistant, and he continued to have suicidal thoughts and "plans without intent." Were that to change and Mouradian expressed any *specific* intentions to hurt himself, Mouradian agreed with Hakes that he would tell Jail staff that he needed to speak with her as a means to signal Hakes that he needed to be placed in the side cell on precaution as he would otherwise refuse to tell jail staff that he intended harm himself. Hakes similarly informed Bowe and Jacobson of this plan.

After their meeting on December 20, 2019, Hakes and Mouradian did not meet again until February 2020. Following a medication reevaluation on January 3, 2020, however, APNP Jacobson recorded in a SOAP note that Mouradian's depressive symptoms persisted.

On February 14, 2020, the Jail implemented Policy 723, governing its "Suicide Prevention and Intervention." After it was issued, Jail staff were further instructed to send an alert requiring staff to confirm that they had received the new policy, although multiple Jail staff members, including Officer Keller, did not confirm actually receiving Policy 723. In particular, that policy instructs that "[i]nmates who are not actively suicidal but who

have expressed suicidal thoughts or have a recent history of self-injurious behavior should be observed by staff at irregular intervals, not to exceed every 15 minutes."

## 2. Chapter 51 Commitment

On February 20, 2020, after Mouradian indicated that he did not need to meet with Psychologist Hakes, she reported to Jail Captain Bowe and APNP Jacobson her concern that Mouradian's plea hearing, which was scheduled for the next day, February 21, may impact his mental health *and* to be aware of any changes, including what could appear to be an improvement. The next day, Captain Bowe learned that at Mouradian's plea hearing, his attorney told the court that he "couldn't enter the plea because [Mouradian] tried to kill himself in the jail last night." In turn, Captain Bowe reported this to Dr. Hakes, who agreed with his recommendation to place Mouradian in a side cell with 30-minute checks and no bedding.

After this incident, Captain Bowe followed up with Mouradian, his attorney, and his cellmate to learn more. In particular, Mouradian denied attempting to hang himself, and Captain Bowe observed neither marks on his body nor items in his cell that would indicate he attempted to hang himself. Mouradian's attorney clarified that while Mouradian had told him he was looking around for something to hang himself with, he did not *actually* attempt to hang himself. Similarly, Mouradian's cellmate was unaware of any potential suicide attempts.

On February 28, 2020, Mouradian met again with the Jail's contracted psychologist, Hakes. During this meeting, Mouradian stated that: (1) he was extremely frustrated to have been placed on precaution; and (2) he "inten[ds] to kill himself; that he has made up

6

his mind." After this meeting, Hakes recommended a Chapter 51 commitment.[5]  A crisis worker from Northwest Connections, a nondefendant, assessed Mouradian that same day and also determined that an emergency detention was appropriate.  Mouradian was then immediately transferred to Sacred Heart Hospital in Eau Claire.

On March 2, 2020, Hakes sent an email to Jail Captain Bowe, APNP Jacobson, and another nondefendant, Stephanie Kennedy, a Northwest Connections employee,[6] documenting Mouradian's history of depression and suicidal ideation at the Jail.  In this email, Hakes shared her opinion that "although Mouradian [had] not outwardly said it, [she did] not believe [Mouradian] has any intention of going to prison and [she] would not be surprised if he has a plan to [commit] suicide before a transfer to Dodge Correctional," a Wisconsin Department of Corrections ("DOC") facility.  On March 5, 2020, Hakes and Kennedy also exchanged emails expressing concern for Mouradian's resistance to treatment and appropriate next steps, including time at a mental hospital for more intensive programming and a possible, 90-day settlement agreement.[7]

On March 13, 2020, Mouradian was transferred to DOC's Winnebago Mental Health Institute in Oshkosh.  During his time there, Mouradian was prescribed a new

---

[5] Chapter 51 commitment refers to an involuntary civil commitment for persons who are deemed by a state circuit court to be a danger to themselves and in need of treatment under Wis. Stat. § 51.20.

[6] "Northwest Connections" is a 24/7 emergency crisis line that has contracted with Jackson county to provide additional mental health services and controls Chapter 51 emergency detentions. (Dkt. #150, ¶¶ 15-16.)

[7] Such "settlement agreements" under Chapter 51 are generally negotiated contracts, providing a structured plan for treatment to help individuals receive mental health services.

medication, and he signed a 90-day settlement agreement requiring him to meet with Jail Psychologist Hakes weekly, as well as to comply with his medications.

### 3. Return to Jackson County Jail

Mouradian returned to the Jail on March 18, 2020, although he was not placed on any heightened precaution. After meeting with Mouradian on March 20, 2020, Hakes reported to Captain Bowe and APNP Jacobson that his mood had improved and his thoughts evidenced less depressive content. Hakes also emailed Jacobson to ensure that Mouradian's new medication, fluphenazine, was included in his chart, fearing that he may decompensate without it. After their next meeting on March 27, 2020, however, Hakes noted that Mouradian continued to feel hopeless, though the frequency and intensity of his suicidal ideations had decreased. Hakes also reported these impressions to Nurse Jacobson and Captain Bowe.

On April 6, 2020, Kennedy inquired into Mouradian's status. Hakes indicated that "[Mouradian was] more stable than [she had] ever seen him in the past year," although APNP Jacobson did not respond regarding Mouradian's medication compliance. On April 10, Mouradian reported to Jail Psychologist Hakes that one of his medications, fluphenazine, was making him feel worse with regard to hopelessness and he wanted to stop taking it. Mouradian also reported this issue to both Captain Bowe and APNP Jacobson. Although Nurse Jacobson did not agree to stop this medication until she met with Mouradian on April 15, he nevertheless had already stopped taking fluphenazine by that point. Still, Hakes had also informed Bowe that (1) Mouradian denied having any

safety concerns and (2) Mouradian and Hakes had discussed the possibility of Mouradian taking on a job doing laundry.

On April 14, 2020, Mouradian was observed wrapping a towel around the bars of his cell and looking around his cell, as if he might be searching for a place to tie something. That day, nondefendant Captain Rich instructed the night staff to keep an extra diligent eye on Mouradian because of his history. On April 15, APNP Jacobson reported that Mouradian did not have suicidal thoughts, intent, or plans, but would not tell anyone if he had because of the adverse consequences. During his next meeting with Hakes on April 16, 2020, Mouradian initially presented as quite depressed; however, at the end of the meeting, Mouradian stated that Hakes had "instilled some hope." He again denied any security concerns, stating that he would start working in the laundry.

On April 24, 2020, Mouradian pleaded guilty to four Wisconsin felony counts, and his sentencing hearing was scheduled for July 2. At that time, Psychologist Hakes neither recommended nor did the Jail implement any special or protective measures for Mouradian. On April 30, Hakes again recorded that Mouradian's mood was impaired and slightly depressed, and emailed Captain Bowe to inform him of these updates but that there were no safety concerns. On May 4, 2020, in response to an email from Kennedy, Hakes stated that: "Mouradian had a bit of a setback with his plea hearing, but his mood is slightly better than it was prior to his hospitalization"; and "she anticipate[s] a similar setback as he approaches his sentencing in July." Hales also asked about extending the 90-day settlement agreement, to which Kennedy responded that the agreement could not be extended.

9

On May 7, 2020, Hakes reported that Mouradian's mood is not great, but better than it has been, and she noted again that there were no current safety concerns. Later that day, a Jackson County circuit judge dismissed Mouradian's 90-day settlement agreement. In response, Hakes did not recommend any additional precautions or observations. On May 13, 2020, no longer bound by the obligations of the settlement agreement, Mouradian also declined to meet with Hakes.

Psychologist Hakes met with Mouradian for a 25th time on May 21, 2020. In her notes, she indicated that Mouradian reported significant guilt and shame and that his thoughts still evidence depressive content, but he did not mention any current safety concerns. In an email report afterward to Captain Bowe, Hakes stated that: the session was very productive; Mouradian participated more than in the past; she believed they would see improvement should Mouradian work through what she identified; and she would be back on May 28, to meet with Mouradian again. Until then, Hakes did not recommend any increased observations of Mouradian, nor was she contacted by anyone from the Jail between this meeting and May 28.

### 4. Mouradian's Suicide

At the Jackson County Jail, the night "B shift" runs from 6:00 p.m. to 6:00 a.m. and is staffed by two correctional officers. From 6:00 p.m. to 2:00 a.m., these officers are also assisted by at least one other correctional officer and a sergeant. Every four hours, Jail staff also rotate between positions in the control room and the floor. During the 2:00 a.m. to 6:00 a.m. shift, however, there is only one staff member in the control room and one staff member on the floor. The primary responsibility of the floor officer is to conduct timely

wellness checks of inmates in their assigned area by walking through each cell block to observe each inmate visually at least once every hour at staggered intervals. The control officer also supplements the individual wellness checks performed by the floor officer through observation of camera feeds originating from inside and outside of the facility. However, there is no written or unwritten policy regarding how often the control officer should be examining these feeds. The feeds also help the control officer know when to lock and unlock doors to facilitate officer and inmate movement around the Jail.

On May 27, 2020, defendants Keller and Johnson were working the night B shift. As of May 27, both defendants were aware that Mouradian had been on suicide watch and received inpatient mental healthcare at times during his incarceration. However, on the night of May 27, Mouradian was not under heightened precautions that would require more frequent checks of his cell. Between 10:00 p.m. to 2:00 a.m., Johnson was floor officer on Mouradian's side of the Jail and conducted a walk-through of the facility at 1:20 a.m., but did not observe any concerning behavior from Mouradian or any other inmate.

At 2:00 a.m., Johnson assumed the control officer post, while Keller assumed the post of floor officer. Having reached the conclusion of their shifts, Sergeant Oates and Correction Officer Frey were preparing to leave the facility. Moreover, for approximately 10-12 minutes, as the remaining two officers on duty, Johnson and Keller discussed various jail related issues with each other and non-defendants Frey and Oates.

At 2:12 a.m., Oates and Frey left the control room, while Johnson monitored their exit on the video feeds. At 2:13 a.m., Keller left the control room area to begin conducting wellness checks. A moment later, Johnson noticed an inmate in E block appeared to be

kneeling next to the cell bars. Based on what he observed, Johnson then radioed Keller, telling her to go to E block. While this message was apparently not received, Keller entered E block and observed Mouradian hanging from the cell bars at 2:14 a.m. She radioed Johnson twice requesting assistance. After receiving her second transmission, Johnson notified dispatch that assistance was needed.

In the meantime, Keller obtained tools to cut Mouradian down and perform CPR. By 2:19 a.m., Keller and Johnson were able to enter Mouradian's cell and cut him down. EMS arrived at approximately 2:28 a.m., and Mouradian was transported to a nearby hospital, arriving at approximately 2:50 a.m. At 3:12 a.m., a nurse from the hospital called the Jail and informed Officer Johnson that Mouradian had passed away.

Surveillance footage reviewed after the incident showed that: beginning around 1:27 a.m. (just after Johnson's wellness check), Mouradian spent some time putting his blanket over his head and moving towels on and off his cell door; at 1:59 a.m. (around the same time as the shift change), Mouradian took the towels around his cell door and tied them, effectively "sealing" the door; and immediately after that, he manufactured a noose from his bed sheet, tied it around his neck, and hung himself in view of the camera.

## C. Procedural History

Four months after Mouradian's death, on September 23, 2020, the Estate's present counsel submitted an open records request to the Jackson County and (as the external agency chosen to conduct a review of his death) Eau Claire County Sheriff's Departments for all records relating to his death. On or about October 1, 2020, a response was mailed to the Estate's counsel. Included in the response were 56 pages of Mouradian's medical

records and 81 pages of notes from therapy sessions.  The notes from the therapy sessions were primarily authored by defendants Hakes and Jacobson, detailing their interactions with and treatment of Mouradian.  Across all of the notes and records, Jacobson is referenced 64 times in her capacity as the author, the subject of direct references by Hakes, an addressee of memos, and the manager of Mouradian's prescriptions.

Two and a half years later, on March 15, 2023, the Estate filed its initial complaint naming Jackson County, Duane Waldera, Scott Bowe, Lucas Johnson, Linda Keller, Douglas Oates, Ashley Hakes, John Does 1-10 and ABC Insurance Company as defendants, but not Patricia Jacobson or her employer Footprints.  Following a corporate deposition of Jackson County, which mentioned Footprints, and the deposition of Hakes, during which time she disavowed any responsibility for Mouradian's medication, the Estate inquired into Footprints' contract with Jackson County.  Finally, on November 10, 2023, 37 months after they were sent Mouradian's medical records and individual therapy notes, the Estate filed an amended complaint naming Jacobson and Footprints as defendants.

OPINION

In the amended complaint, plaintiff needlessly alleges 14 causes of action, but in response to defendants' summary judgment motions, plaintiff wisely concedes that several claims are best dismissed, including claims under the Americans with Disabilities Act, the Wisconsin Constitution, and state law claims for intentional inflection of emotional distress, safe place, and breach of contract claims.  Plaintiff also acknowledged that its claims for legal fees and indemnification are not separate causes of action while not waiving any rights related to them should it prevail on other claims.

As a result, plaintiff maintains the following federal and state claims against all defendants:

- Count 1 for deliberate indifference to Mouradian's clear need for basic suicide prevention measures in violation of the Fourteenth Amendment;

- Count II for deliberate indifference to Mouradian's need for closer supervision in violation of the Fourteenth Amendment;

- Count III for deliberate indifference to Mouradian's need for and failure to provide adequate medical and psychiatric care in violation of the Fourteenth Amendment;

- Count VII for wrongful death and survivor benefits under Wisconsin statutes; and

- Count XI for common law negligence.

Finally, plaintiff asserts two, other claims:

- Count IV for Fourteenth Amendment municipal liability under *Monell*[8] against Jackson County and its Sheriff, Duane Waldera; and

- Count VI for state law failure to train and supervise, against Jackson County, Sheriff Waldera, and Captain Bowe.

Summary judgment as to plaintiff's remaining claims is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *McNeal v. Macht*, 763 F. Supp. 1458, 1460-61 (E.D. Wis. 1991). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *Anderson*, 477 U.S. at 248. A "dispute of material fact"

---

[8] *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978).

is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

In deciding a motion for summary judgment, the court will view the facts in the light most favorable to the non-moving parties. *Crull v. Sunderman*, 384 F.3d 453, 460 (7th Cir. 2004). Although, as the Seventh Circuit has repeatedly explained, summary judgment is often the "put up or shut up" moment in a lawsuit. *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003). "Once a party has made a properly-supported motion for summary judgment, the opposing party may not simply rest upon the pleadings but must instead submit evidentiary materials that 'set forth specific facts showing that there is a genuine issue for trial.'" *Harney v. Speedway SuperAmerica, LLC*, 526 F.3d 1099, 1104 (7th Cir. 2008) (quoting Fed. R. Civ. P. 56(e)).

## I. Defendant Footprints' First Motion

In their first motion, the Footprints defendants contend they should be granted summary judgment in their favor because there is no dispute of material fact that plaintiff's first amended complaint was untimely as to them when filed in November 2023. In support of this contention, Footprints defendants rely on: (1) an affidavit from Sheriff Dave Riewestahl, stating that the Eau Claire Sheriff's Department sent plaintiff's counsel Mouradian's medical records and mental health records in October 2020 in response to their earlier, faxed request; and a second affidavit from Attorney Jason F. Poje, attesting that these same records contain significant references to Jacobson and her work that should have put plaintiff on notice of her role in Mouradian's treatment at the Jail. In response,

plaintiff argues that this evidence is inadmissible, or in the alternative, is insufficient to put them on notice of plaintiff's claims.

As a threshold matter, plaintiff contends that the evidence relied on by the Footprints defendants is inadmissible. At the summary judgment stage, courts "review only those facts whose substance would be admissible at trial under a form permitted by the Federal Rules of Evidence, although the form produced at summary judgment need not be admissible." *Wragg v. Village of Thornton*, 604 F.3d 464, 466 (7th Cir. 2010). Specifically, plaintiff argues that Sheriff Riewestahl may not testify regarding plaintiff's counsel's open records request without producing that request, which is referred to but not attached to his original affidavit. However, defendant filed an unopposed motion to supplement the record that included the request, so the court will consider it. Plaintiff also argues that defense counsel cannot testify as to the knowledge of or the contents of documents sent to plaintiff's counsel following his open records request because he does not have first-hand personal knowledge of what records were sent. Although plaintiff will need to find another way to present similar records to a jury at trial (e.g., request to admit, stipulation or other proof of authenticity), the affidavits of Footprints' counsel and Sheriff Riewestahl establish a chain of custody for the admissibility of the records that were sent to plaintiff's counsel, such that Footprints' counsel may attest to their contents for purposes of summary judgment. *See Cooper v. Eagle River Mem. Hosp. Inc.*, 270 F. 3d 456, 463 (7th Cir. 2001).[9]

---

[9] Having found this evidence admissible, plaintiff voluntarily dismissed their state law claims against Jacobson, although not those against Footprints.

## A. State Law Claims Against Footprints

As for the statute of limitations that governs actions under state law relating to a health care provider's treatment or omissions in treatment, Wis. Stat. § 893.55(1m), states in relevant part that:

> Except as provided by subs. (2) and (3), an action to recover damages for injury arising from any treatment or operation performed by, or from any omission by, a person who is a health care provider, regardless of the theory on which the action is based, shall be commenced within the later of:
>
> (a) Three years from the date of the injury, or
>
> (b) One year from the date the injury was discovered or, in the exercise of reasonable diligence should have been discovered, except that an action may not be commenced under this paragraph more than 5 years from the date of the act or omission.

The parties agree that this statute applies to both plaintiff's tort and contract claims, *Estate of Kohls v. Brah*, 57 Wis. 2d 141, 144, 203 N.W.2d 666 (1973),[10] but differ as to *when* the statute began to run in this case.

Defendants maintain that the Estate discovered Footprints' involvement no later than receipt of Mouradian's medical records by plaintiff's counsel in response to the Estate's open records request in October 2020, meaning that the statute of limitations expired three years after Mouradian's death -- on May 28, 2023.[11]  In contrast, plaintiff

---

[10] Federal courts exercising supplemental jurisdiction over state law claims are obligated to follow the applicable substantive state law, including statutes of limitations. *Felder v. Casey*, 487 U.S. 131, 151 (1988); *Guaranty Trust Co. v. York*, 326 U.S. 99, 109-10 (1945).  Statutes of limitations are also considered substantive under Wisconsin law.  *Betthauser v. Med. Prot. Co.*, 172 Wis. 2d 141, 149, 493 N.W.2d 40 (1992).

[11] Under this factual scenario, the statute of limitations would be calculated pursuant to Wis. Stat. § 893.55(1m)(a).

argues the statute of limitations was tolled until at the earliest August 2023, when the Estate claims to have first discovered Footprints' involvement in Mouradian's care. This would mean the Estate had until August 2024 to timely name Footprints as a defendant under Wis. Stat. § 893.55(1m)(b).

As with the applicable statute of limitations here, Wisconsin generally follows the "discovery rule" for determining the date on which a cause of action has accrued for instances where "negligence and a resulting injury do not occur simultaneously." *S.J.D. v. Mentor Corp.*, 159 Wis. 2d 261, 265, 463 N.W.2d 873 (1990) (citing *Hansen v. A.H. Robins Co., Inc.*, 113 Wis. 2d 550, 560, 335 N.W.2d 578 (1983)). In such cases, as here, "the statute of limitations begins to run when the potential plaintiff discovers the injury, or in the exercise of due diligence should have discovered the injury." *Id.* at 265-66 (citing *Hansen*, 113 Wis. 2d at 560). A cause of action only accrues when (1) the plaintiff "discovers both the nature of his or her injury and its cause"; and (2) "the relationship between the injury and its cause [is] more than a layperson's hunch or belief." *Id.* at 266 (citing *Borello v. U.S. Oil Co.*, 130 Wis. 2d 397, 406-07, 412, 388 N.W.2d 140 (1986)). Thus, the discovery rule protects plaintiffs where a lapse exists between the injury and the discovery of facts necessary to alert them to their injury, its cause, or the facts underlying the wrong committed against them, *Hansen*, 113 Wis. 2d at 560, although a five-year absolute cap from the date an alleged act or omission applies arising out of medical treatment or operation by a health care provider under Wis. Stat. § 893.55(1m)(b), which is this case would be no later than May 28, 2025.

Under the discovery rule, the statute of limitations starts running when the plaintiff has sufficient evidence that an identified person committed a wrong. *Pritzlaff v. Archdiocese of Milwaukee*, 194 Wis. 2d 302, 315-16, 533 N.W.2d 780 (1995); *see also Christ v. ExxonMobil Corp.*, 2015 WI 58, ¶ 5, 362 Wis. 2d 668, 866 N.W.2d 602 (discovery rule permits accrual of wrongful death claims to occur after decedent's death). Consequently, a tort-based claim begins to accrue "when the identity of the defendant is discovered." *Spitler v. Dean*, 148 Wis. 2d 630, 637-38, 436 N.W.2d 308 (1989). However, whether a claim has accrued based on what a plaintiff knew or should have known is a question that needs to be addressed with respect to *each* specific defendant. *See John Doe 1 v. Archdiocese of Milwaukee,* 2007 WI 95, ¶ 2, 303 Wis. 2d 34; 734 N.W.2d 827 (finding different statutes of limitations applied to different defendants being sued over claims arising from common set of facts); *Baldwin v. Badger Mining Corp.*, 2003 WI App 95, ¶¶ 11-20, 264 Wis. 2d 301, 663 N.W.2d 382 (same).

Even for the same claims in the same case, therefore, when the statutes of limitations begins to run as to a specific defendant depends on what a plaintiff could have discovered through the exercise of reasonable diligence as to that defendant. *Jacobs v. Nor-Lake, Inc.*, 217 Wis. 2d 625, 636, 579 N.W.2d 254 (Ct. App. 1998). "Reasonable diligence" means that a plaintiff must be as diligent "as the great majority of persons would [be] in the same or similar circumstances." *Spitler*, 148 Wis. 2d at 638 (citing *Hilker v. Western Automobile Ins. Co.*, 204 Wis. 1, 15, 231 N.W. 257, 235 N.W. 413 (1931) (opinion on reconsideration)). "Plaintiffs may not close their eyes to means of information reasonably accessible to them and must in good faith apply their attention to those particulars which

19

may be inferred to be within their reach." *Id.* (citing *Kanack v. Kremski*, 96 Wis. 2d 426, 432, 291 N.W.2d 864 (1980)).

Accordingly, the question before the court is when the Estate had or should have had an objective basis for determining that the Footprints defendants played a role in Mouradian's care *and* his alleged, wrongful injury. Based on undisputed material facts of record at summary judgment, the court concludes that plaintiff would have discovered its claim against Footprints through the exercise of reasonable diligence well before November 10, 2022 -- the last possible date for plaintiff's amended complaint to be timely under Wis. Stat. § 893.55(1m)(b).

In *Groom v. Pros. Ins. Co.*, 179 Wis. 2d 241, 507 N.W.2d 121 (Ct. App. 1993), the Wisconsin Court of Appeals was confronted with a plaintiff who was sent her deceased husband's hospital records in February 1987, three months after he passed. *Id.* at 246. Those records named three physicians connected with her husband's care. *Id.* at 250. In her original complaint, filed in November 1989, however, the plaintiff only named one of those physicians as a defendant, while her amended complaint filed in January 1991 -- more than three years from the production of the hospital records -- plaintiff added a second physician and the medical group in which both were members. *Id.* at 251. On these facts, the Wisconsin Court of Appeals concluded as a matter of law that "minimal inquiries would have disclosed" the claims against these newly named defendants well before February 1990, the cut off to have the amended complaint in compliance with Wis. Stat. § 893.55(1m)(b) and, therefore, plaintiff's amended complaint against the second physician and the medical group was untimely filed. *Id.* at 251-52.

Here, just four months after Mouradian's death in October 2020, plaintiff's counsel received Mouradian's medical records which contained multiple medical providers. Nevertheless, similar to *Groom,* in the original complaint, only one medical provider (Psychologist Hakes) was named as a defendant. More than three years after plaintiff received the deceased's medical records through its counsel, an amended complaint was filed that purported to add another medical provider named in the medical records (Jacobson) and her employer (Footprints) as defendants. Moreover, as in *Groom*, there were significant references in the medical records to Jacobson's treatment notes, what information was passed to her, and the medications she prescribed. Therefore, this court follows *Groom* in finding that had plaintiff exercised reasonable diligence, including minimal inquiry into the medical professionals identified in the records received, plaintiff would have discovered the possible connection between Mouradian's suicide and Footprints' involvement in his medications well before November 2022. As a result, the state law claims asserted against Footprints are untimely under Wis. Stat. § 893.55(1m)(b).[12]

In response, plaintiff argues that nothing in the medical records originally produced implicated Footprints' liability for Mouradian's medical care, but this argument overlooks what information plaintiff possessed *and* what, with reasonable diligence, it could have and should have known. Specifically, on or around October 1, 2020, Plaintiff was sent medical records reflecting care received from multiple providers who were under contract to provide

---

[12] The court expresses no opinion as to the timeliness of any cross-claims against the Footprints defendants.

physical and mental health treatment, not just to Jail detainees, but to Jacobson in particular.  Instead of performing inquiries into those providers, plaintiff was content to bring its original suit against Hakes and assume -- while holding records that directly contradicted that assumption -- she was personally managing Mouradian's medications. Indeed, given Hakes' qualifications, plaintiff (or at least its counsel) should have known that Hakes, as a psychologist, could only have prescribed pharmaceuticals in consultation with someone licensed to do so.  (Dkt. #147, ¶ 36.)  Because plaintiff failed to pursue Jacobson or Footprints with reasonable diligence and add them as defendants in a timely manner, the state law claims against them will be dismissed as barred by the applicable statute of limitations.

### B.  Federal Claims Against Footprints Defendants

The parties disagree on how the discovery rule applies to plaintiff's federal claims. The Footprints defendants contend that it is the same statute of limitations as the state-law claims discussed above; however, plaintiff contends that the federal claims are subject to Wis. Stat. § 893.53 which states that  "[a]n action to recover damages for an injury to the character or rights of another, not arising on contract, shall be commenced within 3 years after the cause of action accrues, except where a different period is expressly prescribed, or be barred." Regardless of which statute applies, plaintiff's federal claims against the Footprints defendants are untimely.[13]

---

[13] The analysis of plaintiff's federal clams under Footprints defendants' theory would be the same as their state law claims *supra*.

For the same reasons discussed above, plaintiff had three years from when it could have discovered the Footprints defendants through the exercise of reasonable diligence. *Jacobs*, 217 Wis. 2d at 636.  Once again, plaintiff argues that it could not have known, or through reasonable diligence discovered, that the Footprints defendants were involved with Mouradian's care at the time of his death.  However, this argument is incompatible with the undisputed facts.  As for Jacobson, the Estate was sent Mouradian's medical and mental health records on October 1, 2020.  This limits reasonable inferences on when the records were received to early October.  Because "plaintiffs may not close their eyes to means of information reasonably accessible to them and must in good faith apply their attention to those particulars which may be inferred to be within their reach," the only reasonable inferences are that the Estate was aware of Jacobson and her role in Mouradian's treatment at that time as well.  *Spitler*, 148 Wis. 2d at 638 (citing *Kanack v. Kremski*, 96 Wis. 2d 426, 432, 291 N.W.2d 864 (1980)).  Therefore, plaintiff's three year statute of limitations began to run in early October 2020 and ended in early October 2023, prior to filing its amended complaint naming Jacobson.  Additionally, like *Groom*, discussed above, minimal inquiries into Jacobson would have revealed that her services for the Jail were provided pursuant to the Jail's contract with Footprints.  Therefore, plaintiff's federal claims in the amended complaint naming Jacobson and Footprints as defendants will be dismissed as well.

## C. Equitable Tolling

In an attempt to save its claims against the Footprints defendants, plaintiff asks the court to apply the doctrine of equitable tolling.[14]  If "despite the exercise of reasonable diligence, [a plaintiff] cannot discover his injurer's (or injurers') identity within the statutory period, he can appeal to the doctrine of equitable tolling to postpone the deadline for suing until he can obtain the necessary information."  *Sidney Hillman Health Ctr. of Rochester v. Abbott Lab'ys, Inc.*, 782 F.3d 922, 930 (7th Cir. 2015) (citations omitted).  However, "[e]quitable tolling is an extraordinary remedy and so is rarely granted."  *Obriecht v. Foster*, 727 F.3d 744, 748 (7th Cir. 2013) (cleaned up).  Specifically, for equitable tolling to apply, plaintiff must show that (1) it was diligent in pursuing the claim; *and* (2) that an extraordinary circumstance outside of its control prevented it from being able to file a timely complaint.  *Menominee Indian Tribe of Wisconsin v. United States*, 577 U.S. 250, 255-57 (2016).

Plaintiff has failed to satisfy either element.  As to its diligence, plaintiff highlights its initial complaint was filed with the assumption that defendant Hakes was responsible for medication management and, had the original defendants identified Jacobson or Footprints as persons with relevant information sooner, plaintiff could have discovered Jacobson's involvement in August 2023.  However, the assumption that Hakes was *solely* responsible for medication management was based on the same documents plaintiff had in early October 2020, which identified Jacobson and Footprints as the prescriber.  Filing a

---

[14] In their moving brief, Footprints defendants argued that the relation back doctrine did not apply. Plaintiff did not raise any arguments in response; therefore, the court does not address this issue.

complaint with an assumption that is directly contradicted by records in plaintiff's possession is a far cry from reasonable diligence.

As for extraordinary circumstances, plaintiff notes that information regarding *who* provides healthcare services to the Jail is not public.  However, this ignores the fact that they had Mouradian's medical and mental health records that included references to Jacobson *and* listed her as the prescriber of Mouradian's medications in October 2020. Since plaintiff identifies no other circumstances -- extraordinary or otherwise -- that would have prevented the filing of a timely complaint against the Footprints defendants, the court appears to have no basis to exercise its discretion and apply the doctrine of equitable tolling.

Having found that the doctrine of equitable tolling does not apply to plaintiff's claims against the Footprints defendants, the court will grant their first motion for summary judgment.  As a result of this holding, the court also denies the following motions as moot:

- plaintiff's motion for a hearing regarding the Footprints defendants' motion for summary judgment (dkt. #90);

- Footprints defendants' second motion for summary judgment (dkt. #108); and

- plaintiff's motion to strike Footprints defendants' brief in reply, and supplemental proposed findings of fact in support of their second motion for summary judgment (dkt. #153).

## II.  The Estate's Federal Claims

In counts I-III, plaintiff also claims that all defendants acted in violation of Mouradian's constitutional rights by wrongfully failing to protect Mouradian against harmful prison conditions and, ultimately, suicide.  In count IV, plaintiff claims that the constitutional violations in counts I-III were the result of a custom, practice, or policy that was substantially likely to result in the constitutional violations that resulted in Mouradian committing suicide at the Jail.

The parties disagree on which legal standard applies to the claims concerning Mouradian's confinement at the time of his death, the Fourteenth Amendment or the Eighth Amendment.  To succeed under the Eighth Amendment, plaintiff must prove that: (1) "[Mouradian's] medical condition [was] objectively, sufficiently serious," and (2) "that prison officials acted with a sufficiently culpable state of mind, i.e., that they both knew of and disregarded an excessive risk to inmate health."  *Lewis v. McLean*, 864 F.3d 556, 563 (7th Cir. 2017) (internal citations and quotations omitted).   To succeed under the Fourteenth Amendment, plaintiff must prove that: (1) there was a strong likelihood that Mouradian would seriously harm himself; (2) the defendants failed to take reasonable measures to prevent Mouradian from harming himself, even though a reasonable person under the circumstances would have understood the risk involved, making the consequences of defendants' conduct obvious; and (3) Mouradian would have suffered less harm if the defendants had not disregarded the risk.  *Pittman by & through Hamilton v. Madison Cnty., Illinois*, 108 F.4th 561, 572 (7th Cir. 2024), *reh'g denied*, No. 23-2301, 2024 WL 3889635 (7th Cir. Aug. 21, 2024), and *cert. denied*, 220 L. Ed. 2d 443 (Jan. 27, 2025).

Citing *Kingsley v. Hendrickson*, 576 U.S. 389 (2015), defendants argue that because Mouradian had pleaded guilty to his felony charges, his rights at the Jail are governed by the Eighth Amendment, while citing *Echols v. Johnson*, 105 F.4th 973 (7th Cir. 2024), plaintiff argues that the Eighth Amendment does not apply until a person has been "convicted of a crime *and serving a sentence*," *id.* at 977 (emphasis added).  For the purposes of the court's analysis at summary judgment, the court will apply the Fourteenth Amendment standard, although for the reasons explained below, beginning with Hakes, defendants are entitled to summary judgment as a matter of law regardless of which standard the court applies.  Specifically under the Fourteenth Amendment, the court is to consider the "information available at the time, resisting the temptation to employ 'the 20/20 vision of hindsight.'" *Est. of Wallmow v. Oneida Cnty.*, 99 F.4th 385, 391 (7th Cir. 2024) (quoting *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015)).  "The facts should point directly at suicidality, for a deceased's 'general distress and history of psychiatric treatment would give a reasonable officer notice of general distress and a history of psychiatric treatment, not risk of suicide.'" *Id.* (quoting *Jump v. Vill. of Shorewood*, 42 F.4th 782, 794 (7th Cir. 2022).  "Reasonableness, in turn, must be determined in light of the totality of the circumstances." *Pulera v. Sarzant*, 966 F.3d 540, 550 (7th Cir. 2020) (citing *McCann v. Ogle Cnty.*, 909 F.3d 881, 886 (7th Cir. 2018)).

## A. Hakes

Because Hakes is a licensed psychologist with a master's and doctoral degree from the Wisconsin School of Professional Psychology, her decisions regarding Mouradian's treatment and supervision are subject to the professional judgment standard.  Certainly, as

a licensed psychologist, decisions regarding an inmate's mental health treatment and suicide risk are within Hakes' area of professional expertise. Thus, the court must consider the reasonableness of Hake's exercise of her professional judgment. *Collignon v. Milwaukee Cnty.*, 163 F.3d 982, 988-89 (7th Cir. 1998).

In the context of a claim for inadequate medical care in particular, the professional judgment standard requires essentially the same analysis as the Eighth Amendment standard: (1) "plaintiff's medical needs must have been objectively serious"; and (2) the defendant's decision was "such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment" demonstrated by evidence "that the professional knew of the serious medical need" and "disregarded it." *Id.* at 989. A medical professional may only be found liable for a constitutional violation if "no minimally competent professional would have responded similarly under those circumstances." *Scott v. Moss,* No. 24-1479, 2025 WL 48412, at *2 (7th Cir. Jan. 8, 2025) (citing *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014)). Moreover, a psychologist's judgment regarding an inmate's mental health needs is entitled to deference. *Scott v. Moss*, No. 24-1479, 2025 WL 48412, *2 (7th Cir. Jan. 8, 2025).

Of course, plaintiff disputes that the professional judgment standard applies, comparing this case to *Mombourquette v. Amundson*, 469 F. Supp. 2d 624 (W.D. Wis. 2007), where the court refused to defer to the judgment of a jail's registered nurse in charge of mental health after she disregarded a psychiatrist's order to put a detainee on suicide watch following their discharge from the hospital. *Id.* at 639-41. However, this case is

28

distinguishable in three crucial ways.  First, unlike Hakes, who has a master's and doctoral degree in psychology, the nurse in *Mombourquette* could point to no evidence that she was qualified to make a mental health determination, *let alone disregard the discharge instructions from a psychiatrist*.  *Id.* at 640.  Second, unlike Hakes' frequent evaluations of Mouradian's mental health and suicide risk, there was no record that the nurse in *Mombourquette* even evaluated the inmate's suicide risk.  Third, and most fundamentally, the only evaluation in the record came from a hospital psychiatrist instructing that the inmate be placed on suicide watch.

Plaintiff also argues that the court should not apply the professional judgment standard because Hakes does not expressly state that she made a judgment call in not recommending increased treatment or precautions for Mouradian.  This argument comes without plaintiff offering any support in case law, or otherwise.  More importantly, a reasonable trier of fact could only find that Hakes' report to Captain Bowe, including her email indicating no security concerns following her May 20, 2020, meeting with Mouradian required the exercise of professional judgment based on her personal observations of Mouradian during their 25 meetings over 40 weeks before his suicide, other information passed on to her by Jail staff, and her own detailed notes.  Thus, plaintiff fails to show that Hakes' involvement is not subject to the professional judgment standard.

To overcome professional judgment deference, plaintiff must point to evidence that shows, or at least supports a reasonable inference, that "no minimally competent professional would have responded similarly under those circumstances."  *Scott*, 2025 WL 48412 at *2.  In particular, plaintiff highlights:  the comments Mouradian made between

August and December of 2019 regarding suicidal ideations with a plan; Hakes' concerns that Mouradian may worsen around his plea and sentencing hearings; Hakes' advising Jail staff before Mouradian's February 21, 2020, plea hearing to pay attention to behavioral changes, *including* improvements; Mouradian's statement on February 28, 2020, that he "inten[ds] to kill himself"; his emergency commitment under Wisconsin Chapter 51 from February 28, 2020, to March 18, 2020; Hakes's March 2, 2020, email indicating that she would not be surprised if Mouradian had a plan to commit suicide before any transfer from the Jail to state prison; observations made by Jail staff of Mouradian wrapping a towel around the bars of his cell on April 14, 2020; Mouradian's statement to Hakes on April 17, 2020, that he "wants to die"; Mouradian's worsened mood following his guilty plea on April 24, 2020; the termination of Mouradian's 90-day settlement agreement under Chapter 51 on May 7, 2020; his subsequent decision to not meet with Hakes on May 13, 2020; after her final meeting with Mouradian on May 21, 2020, Hakes' note that Mouradian's thoughts "still evidenced depressive content"; and finally, the opinion of plaintiff's expert, Dr. Eugene Braaksma, that there were a variety of significant risk factors that would have prompted him to place Mouradian on suicide watch.

By comparison, Hakes highlights: the frequent oscillations in Mouradian's mental health during his time at the Jail; the numerous methods utilized by Hakes to combat Mouradian's resistant depression symptoms, including behavioral therapy, positive psychology, supportive psychotherapy, and dialectical behavioral therapy; evidence of Mouradian doing laundry, reading, and exercising in April of 2020; the extreme frustration that Mouradian expressed after being placed on suicide watch; Mouradian having never

30

attempted suicide before or while in jail; Hakes' contemporaneous observation that their final session together was very productive; Hakes' use of her professional judgment to continue treating Mouradian through both pharmacological and therapeutic intervention; *and* Dr. Braaksma's concession that under the circumstances of this case, other reasonable psychologists would have agreed with Hakes' decision *not* to place Mouradian on suicide watch.

This latter evidence wholly undermines plaintiff's reliance on Dr. Braaksma's opinion that *he* would have placed Mouradian on suicide watch following his behavior in April. Specifically, "[w]hile such a dispute might state a negligence cause of action, it *cannot* make out a substantive due process claim." *Collignon*, 163 F.3d at 990 (citing *Youngberg v. Romeo*, 457 U.S. 307, 321 (1982)) (emphasis added). Rather, Dr. Braaksma's acknowledgement that other reasonable psychologists would agree with Hakes' judgment and refrain from putting Mouradian on suicide watch essentially *precludes* a jury from finding that *no* minimally competent professional would have responded similarly under the circumstances, at least absent a qualified expert's opinion to the contrary. (Dkt. #151, ¶ 177.)

Despite Braaksma's concessions, plaintiff still argues that this court should allow a lay jury to second guess Hakes' judgment because she ignored her own, previous opinions regarding Mouradian shortly before his suicide. *See Ortiz v. Webster*, 655 F.3d 731, 735-36 (7th Cir. 2011) (reversing summary judgment on the grounds that the medical provider "ignored his own opinion"). However, Hakes' opinions that plaintiff argues were contradictory -- Mouradian having a plan to commit suicide before any transfer to prison

31

and his anticipating that the time around his plea and anticipated sentencing would be difficult -- both of which were offered during Mouradian's Chapter 51 commitment in February 2020, were no more or less her opinions regarding Mouradian's mental health and suicide risk *at that time*.

After Mouradian's Chapter 51 commitment, however, he was released under a 90-day settlement agreement with *no* instruction to be put on suicide watch or take other extraordinary measures, including following a different prescription regimen. Further, Mouradian continued to have no documented suicide or self-harm attempts, took on work responsibilities at the jail, and met regularly with Hakes, during which times, she noted ebbs and flows in Mouradian's mental health. Finally, during their last session, Mouradian showed improvement and did not mention any current safety concerns, which in hindsight might have been a red flag but at the time Hakes viewed positively. Thus, the undisputed record shows that Hakes had concerns about Mouradian's mental health in February that ultimately led to his Chapter 51 commitment, when that commitment ended, Hakes' *concerns had been mitigated and yet she continued to evaluate* Mouradian regularly using her medical judgment to recommend different levels of scrutiny for his safety. This differs materially from the medical provider defendant in *Ortiz* who opined that plaintiff, depending on further evaluation of his vision, would need surgery in the next two years, then *never* reevaluated the plaintiff nor performed surgery. *Id.* at 735.

Additionally, plaintiff points to *Gonzalez v. Feinerman*, 663 F.3d 311 (7th Cir. 2011), for the proposition that a properly instructed jury *may* reasonably infer that Hakes knew Mouradian's current treatment plan was not working and failed to exercise sound

professional judgment by not altering his treatment. *Id.* at 314-15. At the time plaintiff filed his complaint in *Gonzalez*, however, he had been suffering from a hernia for seven years. *Id.* at 314. Further, during the first five years, plaintiff's condition was manageable with mild pain medication, but even after plaintiff's condition and pain worsened markedly in the last two years, his physicians persisted in the same treatment and denied his increasingly ardent requests for surgery. *Id.* at 314-15. Here, unlike these key facts in *Gonzalez*, Hakes documented the many therapy techniques she applied *and* her requests to Jacobson to have Mouradian's medication adjusted to treat Mouradian's condition. In hindsight, Hakes may well have been mistaken in her assessment as to both Mouradian's treatment and risk of suicide, but a jury could not reasonably find *no* minimally competent psychologist would have responded similarly, much less that Hakes had failed to exercise professional judgment at all. To the contrary, the evidence shows Hakes reasonably believed she was bringing about a positive change to Mouradian's overall mental health through the treatment she prescribed.

Also citing *Est. of Hill v. Richards*, 525 F. Supp. 2d 1076 (W.D. Wis. 2007), plaintiff argues that determining whether the failure to prevent Mouradian's suicide was a constitutional violation "is a simple issue -- one that expert testimony and medical judgment is not needed." However, in *Est. of Hill*, this court actually commented that "the court of appeals has never held that expert testimony is dispositive or even particularly important" in determining whether the failure to prevent a suicide was a *potential* constitutional violation. 525 F. Supp. 2d. at 1086 (citing *Matos ex rel. Matos v. O'Sullivan*, 335 F.3d 553, 557-58 (7th Cir. 2003). However, this statement was in relation to whether

a defendant knew of the risk, *not* whether defendant's response to a possible suicide risk was reasonable.  Regardless of the necessity for expert testimony to prove whether Hakes' judgment was reasonable, the facts here are simply not extreme enough for a lay jury to disregard plaintiff's *own* expert's acknowledgement that other reasonable psychologists may have agreed with Hakes' treatment approach.

Having determined that a reasonable trier of fact would be compelled on this record to find Hakes' decisions regarding Mouradian's mental health and level of observation at the Jail were well within her area of expertise as a licensed psychologist, *and* that a minimally competent psychologist could have acted similarly, this court will not second guess Hakes' exercise of professional judgment.  Accordingly, Hakes is entitled to summary judgment as a matter of law on the federal claims against her.

## B.  Correctional Officers and County Defendants

Next, plaintiff claims that the correctional officers on duty on the night of Mouradian's death (Officers Johnson and Keller and Captain Bowe) are liable for failing to prevent his suicide.  More generally, plaintiff claims that Jackson County and Sheriff Waldera, as policymakers, are liable under *Monell* for failing to have an effective policy to prevent suicides like Mouradian's.

### 1.  Correctional Officer Defendants

As correctional officers at the Jail are subject to the Fourteenth Amendment's objective reasonableness standard, defendants Johnson, Keller and Bowe are entitled to defer to the judgment of jail health professionals, so long as they did not ignore

Mouradian's request to be seen by those professionals. *Berry v. Peterman*, 604 F.3d 435, 441 (7th Cir. 2010). Here, the undisputed facts show that each of the correctional officers met this standard. Specifically, there is no dispute that following Hakes' meeting with Mouradian on May 21, 2020, she did *not* recommend more frequent observations of Mouradian. Further, between Hakes' last meeting with Mouradian and his suicide, there is no evidence of behaviors pointing toward his need for a mental health intervention or an increased risk of suicide. Finally, during the night of his death, the records shows: (1) defendants Johnson and Keller performed cell checks at time intervals compliant with Jail policy; and (2) as soon as Johnson and Keller noticed Mouradian's condition, they both took action to provide care as promptly as they reasonably could.

Nevertheless, plaintiff contends, again without citation to any case law or statute, that these jail officer defendants should not be able to rely on the medical opinions of others, having received their own training in suicide prevention and being required to follow policy, as well as the commands of supervisors, such that any reasonable officer would have recognized the need for heightened observation. Unfortunately for plaintiff, this contention is unpersuasive for at least two reasons. First, while the correctional officers here had some training regarding suicide prevention, they never formerly evaluated Mouradian, nor did they have the depth of knowledge and experience that Psychologist Hakes had, to determine a detainee's suicide risk. Second, and more importantly, the Seventh Circuit has repeatedly held that "the law encourages non-medical security and administrative personnel at jails and prisons to defer to the professional medical judgments

35

of the physicians and nurses treating the prisoners in their care without fear of liability for doing so." *Berry*, 604 F.3d at 441 (collecting cases).

As for plaintiff's contention that other policy or direction from supervisors required additional monitoring of Mouradian, plaintiff points this court to Captain Kaylan Rich's instruction to night staff on April 14, 2020 (six seeks prior to Mouradian's suicide) to keep an extra diligent eye on him after he had been observed looking around his cell as if he was searching for a place to tie something. Plaintiff argues that this directive persisted through Mouradian's death and that Officer Johnson defied it during his time in the control room that night. However, there is no evidence of record to support this inference. If anything, when asked how long this directive was for, Captain Rich clarified that she, "Didn't put a limit on it. Just a couple of days, more or less monitoring. If there were any other concerning things since that directive, then it would have been continued." (Dkt. #99, at 108:15-21.) However, in the days and nights immediately following this directive, including a session with Psychologist Hakes, no concerning behaviors were observed. Thus, there is no view of this instruction that would allow a reasonable jury to infer that any special notice was in effect on the evening of Mouradian's suicide.

Having found that the correctional officer defendants were entitled to rely on Hakes' decision not to elevate Mouradian's observation status on the night of his death, no trier of fact could reasonably infer that the officer defendants' actions were objectively unreasonable under the totality of the circumstances. Accordingly, defendants Bowe, Johnson, and Keller are entitled to summary judgment on plaintiff's claim of a Fourteenth Amendment violation as a matter of law as well.

## 2. Jackson County and Sheriff Waldera

To succeed on its claims against Jackson County and Sheriff Waldera under *Monell*, plaintiff must show that Mouradian's injuries were the result of: "(1) an action pursuant to a municipal policy, (2) culpability, meaning that policymakers were deliberately indifferent to a known risk that the policy would lead to constitutional violations, and (3) causation, meaning the municipal action was the 'moving force' behind the constitutional injury." *Hall v. City of Chicago*, 953 F.3d 945, 950 (7th Cir. 2020) (citing *Bd. of Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 404–07 (1997)). Having found that the correctional officer defendants did not violate Mouradian's Fourteenth Amendment rights, the court necessarily also holds that plaintiff's *Monell* claims against defendants Jackson County and Sheriff Waldera must fail as a matter of law. *See Hall v. City of Chicago*, 953 F.3d 945, 950 (7th Cir. 2020) (citing *Bd. of Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 404-07 (1997)) (claims under *Monell* must be supported by an underlying constitutional violation). Therefore, these defendants are also entitled to summary judgment on plaintiff's Fourteenth Amendment claims.

## III. The Estate's State Law Wrongful Death Claims

Plaintiff also asserts a wrongful death claim under Wisconsin law against defendants resting on their allegations that: (1) Hakes and the correctional officer defendants were negligent in preventing Mouradian's suicide; and (2) defendants Jackson County and Waldera negligently trained and supervised the Jail staff. Under 28 U.S.C. § 1367(c)(3), the court may decline jurisdiction over these remaining state law claims. Indeed, the general rule is that, when the federal claims drop out before trial, the district court should

relinquish jurisdiction. *Van Harken v. City of Chicago*, 103 F.3d 1346, 1354 (7th Cir. 1997). This is particularly true where a defendant has raised specific state law defenses, such as discretionary immunity, or it is not readily apparent that the claims fail as a matter of law on the merits. Therefore, the court will relinquish jurisdiction over plaintiff's remaining supplemental state-law claims and dismiss them without prejudice.

## ORDER

IT IS ORDERED that:

1) Defendants Patricia Jacobson and Footprints in Time Midwifery Services LLC's motion to supplement affidavit (dkt. #91) is GRANTED;

2) Defendants Patricia Jacobson and Footprints in Time Midwifery Services LLC's first motion for summary judgment based on statute of limitations (dkt. #63) is GRANTED;

3) Plaintiff's motion for a hearing on Defendants Patricia Jacobson and Footprints in Time Midwifery Services LLC's first motion for summary judgment (dkt. #90) is DENIED as moot;

4) Defendants Patricia Jacobson and Footprints in Time Midwifery Services LLC's second motion for summary judgment on the merits (dkt. #108) is DENIED as moot;

5) Plaintiff's motion to strike defendants Patricia Jacobson and Footprints in Time Midwifery Services LLC's reply brief and supplemental facts in reply to their second motion for summary judgment (dkt. #153) is DENIED as moot;

6) Defendant Hakes' motion for summary judgment (dkt. #112) is GRANTED with respect to plaintiff's Fourteenth Amendment, Americans with Disabilities Act, Wisconsin Constitution, intentional infliction of emotional distress, and breach of contract claims;

7) Defendants Bowe, Johnson, Keller, Waldera, and Jackson County's motion for summary judgment (dkt. #117) is GRANTED with respect to plaintiff's Fourteenth Amendment, Americans with Disabilities Act, Wisconsin Constitution, intentional infliction of emotional distress, and safe place claims;

8)  The court relinquishes jurisdiction over plaintiff's remaining state-law wrongful death, negligence, and negligent failure to train and supervise claims against defendants Hakes, Bowe, Johnson, Keller, Waldera, and Jackson County, which are DISMISSED WITHOUT PREJUDICE;

9)  Defendants John Does 2-10 and ABC Insurance Company are DISMISSED; and

10)   The clerk of court is directed to enter judgment and close this case.

Entered this 10th day of June, 2025.

BY THE COURT:
/s/

_____
WILLIAM M. CONLEY
District Judge